The STATE of Texas, Appellant,

v.

GIFFORD–HILL AND COMPANY, Inc., Appellee.

No. 11589.

Court of Civil Appeals of Texas.

Austin.

May 1, 1968.

Rehearing Denied May 29, 1968.

Crawford C. Martin, Atty. Gen., George Cowden, 1st Asst. Atty. Gen., A. J. Carubbi, Jr., Executive Staff Asst. Atty. Gen., John R. Grace, W. E. Allen, Asst. Attys. Gen., Austin, for appellant.

Clark, Thomas, Harris, Denius & Winters, Austin, Touchstone, Bernays & Johnston, Jim E. Cowles, Dallas, for appellee.

O'QUINN, Justice.

In this lawsuit the State of Texas seeks to collect sales taxes on the cost of transporting materials from the seller's plant to the buyer's job site or other designated destination, in addition to taxes already paid on the price of the materials.

The principal issue is whether the sale took place when the materials left the seller's plant or at the time of delivery to the buyer.

The trial court found in effect that all transportation occurred after the sale and held the seller was not liable for any of the taxes claimed.

From a judgment denying all relief, the State of Texas has appealed.

Gifford-Hill and Company, Inc., is a Texas corporation engaged in mining, producing, and selling sand and gravel and crushed stone called aggregate. The materials are mixed to certain standards as ordered by the customer at various plants operated by Gifford-Hill over the state. After receiving an order for materials, Gifford-Hill prepares the aggregate on the date specified at the plant nearest the location where the buyer will use it. Gifford-Hill does not own or operate trucks to haul aggregate. The materials sold are transported from the plant to the job site, or other destination, by the customer or by common carriers engaged by Gifford-Hill. Transportation charges of the common carrier usually are billed by Gifford-Hill to the buyer of the materials, and Gifford-Hill pays the carrier.

The record shows that Gifford-Hill collected and paid to the State all sales taxes on the quoted price of aggregate at the plant. This suit was brought for taxes on receipts by Gifford-Hill for transportation charges, following a deficiency determination by the state comptroller pursuant to provisions of Articles 20.06 and 20.08, Title 122A, Taxation-General, Vernon's Ann.Civ. Sts. (As amended Acts 1961, 57th Leg., 1st C.S., p. 71, ch. 24, art. I, sec. 1; Acts 1963, 58th Leg., p. 371, ch. 138, sec. 1). The State's claim is the sum of $15,232.31 for taxes, penalties and interest, and for foreclosure of statutory liens. The tax period involved in this suit began September 1, 1961, and ended June 30, 1964.

The State has assigned eight points of error, to which appellee has replied under three points.

The State contends under its points 1, 2, 3, 4 and 7 that the sales of materials took place when delivered to the buyer in accordance with contract of the parties. Appellee rebuts this contention by its counter point that under the sales tax statutes there was a sale prior to transportation, when the materials were segregated at the seller's plant in contemplation of transfer of title or possession.

Under its points 2, 5 and 6, the State urges that the seller and the buyer contracted that delivery would be to the buyer's

job site and that transportation was a service offered by the seller and was a part of the total sales price, so that the sale occurred when the materials were actually delivered at the agreed site. Appellee replies that it contracted with its customers for a sale at the plant before transportation.

The State assigns error under its 8th point that appellee failed to discharge its statutory burden to show that the gross money receipts covering transportation did not come under the sales tax. Appellee contends it met the evidentiary burden required by statute.

Chapter 20 of Title 122A as amended is the "Limited Sales, Excise and Use Tax Act" of Texas. Under these statutes, "sale at retail" means "any sale of tangible personal property," and a "sale"

"* * * means and includes any transfer of title or possession, or segregation in contemplation of transfer of title or possession, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration." Article 20.01, subdivs. (I) (1) and (K) (1).

A "purchase" is defined as:

"Any transfer of title or possession, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatsoever, of tangible property for a consideration." Article 20.01, subdiv. (G) (1).

Chapter 20 provides that money received in payment of charges for transportation prior to a sale to the purchaser is taxable. Article 20.01, subdivs. (D) (1) (c) and (L) (1) (c). But money received by the seller for transportation occurring after a sale is not taxable. Article 20.01, subdivs. (D) (2) (g) and (L) (3) (g). Stated another way, the statutes provide that "receipts" and "sales price" as defined will not allow deduction on account of "* * * cost of transportation of the tangible personal property prior to its sale or purchase." But

"receipts" and "sale price" do not include "Charges for transportation * * * after sale."

The State urges that the controlling issue, stated in the context of these statutory provisions, is whether the sales of materials by Gifford-Hill occurred before or after the incident of transportation from the seller's plant to the purchaser's job site. The State's position is that by construing the statutes together, the sales by Gifford-Hill occurred when delivery was made at the job site and not at the plant when the materials were segregated and placed with a common carrier for transportation to the destination designated by the purchaser.

Gifford-Hill contends that the sales were completed when the materials were segregated at the plant "in contemplation of transfer of title or possession." Under this contention Gifford-Hill points to Article 20.01 (K) (1) in which a sale is defined as "* * * any transfer of title or possession, or *segregation in contemplation* of transfer of title or possession * * *" (Emphasis added).

The State insists that this definition of sale must be construed with subdivision (G) (1) which defines a purchase as "* * * any transfer of title or possession * * * in any manner or by any means whatsoever * * *" and from which definition is omitted any reference to segregation in contemplation of transfer of title or possession. The State construes these two subdivisions to provide that "segregation in contemplation of transfer of title or possession" as used in subdivision (K) (1) can qualify as a sale only when the segregation is accompanied by transfer of title or possession required in subdivision (G) (1) relative to purchase.

The State submits that this construction finds support in subdivision (K) (1) defining a sale in the three alternatives of "(1) any transfer of title, (2) [any transfer of] possession, or (3) segregation in contemplation of transfer of title or possession."

In these three alternatives, the State suggests, this definition was "provided to cover any particular situation which the *parties* have designated as a sale. This statute, by its very alternatives, does not attempt to declare, contrary to a contract, when a sale has occurred."

The State contends that the statute should be interpreted as declaring that the one of its stated events which the parties contracted for as incurring the obligation of a sale is the taxable event. " * * * the vendor certainly cannot by its own unilateral act," the State urges, "contrary to the intent and terms of the purchase contract, effect a statutory sale by a mere segregation of the property in contemplation of a transfer of its title or possession."

Gifford-Hill answers that the sales tax law "does not attempt to change the contract obligations between the buyer and seller, but it defines at which time a sale occurs to provide a taxable event."

"The State's construction of the definition of sale," Gifford-Hill argues, "would rule out completely the terms segregation in contemplation of transfer of title or possession. Under the State's construction there would be no purpose for the term segregation in contemplation of transfer of title or possession since there would have to actually be a transfer of title or possession. The Legislature does not put in meaningless words in statutes and thus had a specific purpose for putting in the phrase, segregation in contemplation or [sic] transfer of title or possession. Under the facts of this case, a sale as defined by the Act occurred at the plant. All transportation occurred after the sale."

Gifford-Hill takes the position that it was the intention of the Legislature to tax transportation costs only if the costs were incurred by the seller before the sale as a part of the sales price. "The Legislature intended this tax to be a sales tax, not a tax upon the transportation of property incident to the sale," avers Gifford-Hill.

We think the taxable event occurred at the time Gifford-Hill and its purchasers provided in their contract that the sale would be completed. To determine when the sale was effective, we must examine the agreements between Gifford-Hill and its customers.

Evidence of these agreements and the course of dealings between Gifford-Hill and its purchasers during the tax period with which this suit is concerned is in the record through several means. In connection with request for admissions and appellee's answer to the requests, numerous exhibits, recognized by both the State and Gifford-Hill as representative samples of agreements, are in evidence. Explanation of the several instruments going to make up agreements was given by a Gifford-Hill employee who worked in the company's sales department beginning in 1948 and during the entire tax period involved. Additional testimony was given by the company's comptroller and by a representative of a common carrier handling a majority of the deliveries from Gifford-Hill plants to customers.

The secretary-treasurer of Gifford-Hill testified at the hearing for re-determination before the state comptroller and again at the trial of this cause. It was his testimony that Gifford-Hill considered the furnishing of the hauler as a customer service. He also testified that Gifford-Hill paid the trucker for hauling charges whether or not the charges were collected from the purchaser. In most instances, he stated, the transportation charges were paid by Gifford-Hill before the company received the money from the customer. The secretary-treasurer further testified that if a truck should break down, Gifford-Hill would send a replacement load to the customer, credit the customer for the first load, charge the transportation company, and charge the customer "only for the load he receives." While Gifford-Hill is not compensated by the customer for making arrangements with the trucker, Gifford-Hill considered its compensation "a service to the customer

and making more sales of rock." The customer had the right to reject a load that did not meet specifications of the contract.

The secretary-treasurer testified that the contract forms used by Gifford-Hill, consisting mainly of a "quotation and sales contract" and an "acknowledgment" with "terms and conditions" on the reverse side of each, were adopted by the company in 1940 when most shipments were by rail. During the tax period under consideration the same forms were used but most shipments were by truck. The witness testified that when the forms were first adopted most transportation by truck was "at a delivered price," but during the tax period in question transportation by truck was, "Practically always f. o. b. the plant." In infrequent instances where sales were made at "a delivered price to the customer's location," the sales tax was charged "on the full delivered price."

The term "f. o. b." is used in two places on the contract forms. On the right hand side of both the "quotation and sales contract" and the "acknowledgment" the term f. o. b. applies to the quoted price per ton, or per cubic yard, of material at the plant. On the left side of these forms the term f. o. b. applies to the agreement to deliver the materials to the destination named.

The "quotation and sales contract" recites, "Subject to terms and conditions herein specified, we quote you on the above materials (details below): * * * "

This phrase is followed by these provisions:

"F.O.B. cars at destination shown below, based on present legally established freight charges from our plant at [name and location of plant].

("Where quotation is F.O.B. loading point, show loading point at destination below.)

"Destinations    Materials    Price
              Per Ton Per Cu. Yd."

That portion of the contract for delivery to destination is separate and distinct from the part pertaining to price of materials. The parties to the contract have used the term f. o. b. to refer to both price of materials at the plant and to destination where the materials will be delivered for the quoted delivered price. Price and delivery are two explicit elements of the contract. Under the "terms and conditions" embodied in both forms used, "The Seller shall have the right to ship from other than the designated point of origin without change of *quoted delivered price*," and "In the event of change of legally established freight rate, the *quoted delivered price* shall be revised accordingly." (Emphasis added).

Gifford-Hill's secretary-treasurer testified that his company was obligated to deliver to the customer at the customer's destination the quality of material ordered. This testimony, taken with the written evidences of sales, supports the contention that the buyer assumed no obligation of ownership until acceptance by the purchaser at the job site or other destination. The secretary-treasurer testified that " * * * the substance is the same, regardless of whether it is a railroad shipment, a truck shipment we directed, or whether the customer picks it up in his truck. If we furnish material which doesn't meet specifications, we make it good, and we make the best of it."

We conclude that under the terms of the sales contracts made by Gifford-Hill during the tax period, as demonstrated by the record, the purchaser contracted for a delivered price. We think the contracts were executory and until the materials were actually delivered to the customer at the job site or other destination named by the buyer, title did not pass and the sale was not complete.

It is settled law in this State that delivery to an agent, such as a common carrier, is usually sufficient to vest the buyer with title, if the goods correspond to the contract and there is no arrangement

to the contrary. 50 Tex.Jur.2d, Sales, sec. 189, pp. 515–516, and cases cited.

The rule is different if the contract of the parties reveals they had a different result in mind. 50 Tex.Jur.2d, Sales, sec. 190, p. 517, and cases cited.

In Greif and Brother v. Seligman, 82 S.W. 533 (Tex.Civ.App., San Antonio, writ ref.) it was held that, "If * * * there be an express agreement that the vendor must actually deliver the goods at the point of destination, and not to be paid for unless so delivered, it would be binding upon the parties, and a delivery to the carrier would not be sufficient." 82 S.W. 533, 534, cols. 1–2. The Greif case has been followed by the courts of this state since that decision in 1904.

The Greif case was followed by this Court in Robert McLane Co. v. Swernemann and Schkade, 189 S.W. 282 (Tex.Civ.App., Austin, no writ), in which the rule was stated as follows:

"If there is a special contract that the goods are to be delivered at a particular place, the title does not pass until they are delivered at such place." 189 S.W. 282, 283, col. 2.

Where a car of corn was shipped to the order of seller who contracted to deliver the corn to the buyer, the corn was held to be the property of the seller until it arrived at destination and was ready for delivery. Wieser & Co. v. Granger Mercantile Co., 237 S.W. 328 (Tex.Civ.App., Austin, no writ), citing the Greif and McLane cases.

In addition to the provisions of the contracts already mentioned, we are mindful of the following paragraphs of the "terms and conditions" which we regard as indicating the parties intended a sale under an executory contract, the sale to be effective only upon delivery of the materials to the buyer at a destination named by the purchaser:

"Jobs quoted for *truck delivery at point of use* are based on delivery of material in truck load lots as near *the desired location on the job* as is accessible to a loaded truck operating under its own power." (Emphasis added).

"This quotation is made subject to acceptance within 30 days from date of quotation * * *"

"All quotations and agreements are *subject to the contingencies* of production and *shipping,* and *the Seller will not be responsible for inability to secure transportation facilities, delays in transit,* strikes * * * or other causes beyond his control." (Emphasis added).

"All contracts and agreements are subject to acceptance by the Home Office of the Seller and * * * approval of his credit department."

The "quotation and sale contract" was signed by Gifford-Hill and by the purchaser, who by signing indicated acceptance of the quotations submitted by Gifford-Hill subject to the "terms and conditions." The "acknowledgment" which followed the "quotation and sale contract" was the writing by which Gifford-Hill acknowledged the order.

We think that the phrase "segregation in contemplation of transfer of title or possession" as used in the statute is not applicable to the facts of this case. It was not a part of the agreement between Gifford-Hill and its customers that segregation at the plant would result in transfer of title or possession to the buyer. On the contrary, the agreement was that Gifford-Hill would deliver the materials to the buyer at a destination named by the customer. Gifford-Hill could not change the agreement without acquiescence of the buyer and make the sale final by separating the materials at the plant and placing them on a truck. Under the executory agreement, Gifford-Hill was still obligated after segregation to deliver the materials to a specified location, where if the aggregate did not meet specifications, there was no sale of the materials. The sale was completed upon presentation of the materials at destination and acceptance

by the buyer. The transportation from the plant to the destination was performed prior to the sale, and receipts for payment of charges for the transportation were subject to the tax imposed by statute.

We are of the opinion that the trial court erred in holding "that no tax, penalties or interest is due on the transportation charges in connection with the sales made the subject of this suit," and that liens on the property or assets of Gifford-Hill filed by the State are void.

The State established a prima facie case by introducing into evidence the certificate of the state comptroller showing the delinquency of Gifford-Hill in payment of the taxes claimed. The certificate declared that "for the period beginning the 1st day of September, 1961, through the 30th day of June, 1964," the tax due and owing the State was $11,556.63. With penalties and interest on the amount of the tax, the State's claim as of June 30, 1965, amounted to $15,232.31. The certificate further showed that interest at six percent per annum on the tax would accrue from June 30, 1965.

Upon this showing by the State, it was the burden of Gifford-Hill to overcome the "prima facie evidence of the determination of the tax or the amount of the tax, of the delinquency of the amounts set forth, and of the compliance of the Comptroller with all the provisions" of the statutes "in relation to the computation and determination of the amounts." Article 20.09(E). Gifford-Hill also had the burden to overcome the "prima facie evidence of the justness and correctness of such claim by the State" stated in the certificate "specifying the amount due together with penalty and interest." Article 20.09(G) (1). Under the sales tax statutes, "it shall be presumed that all gross receipts are subject to the tax until the contrary is established." Article 20.021 (F).

Gifford-Hill accepted this burden before the trial court in the statement, "We are obligated under the statute to have the burden of showing that this audit and this tax is not proper and it is not calculated correctly * * *"

Gifford-Hill contends on appeal that it met the burden of overcoming the State's prima facie case "with evidence to show either the assessment was improper, excessive and illegal, or was arbitrary and illegal." Specifically, Gifford-Hill insists that the Comptroller's audit was "unjust, arbitrary and illegal" because the "auditors had their minds made up that a tax was due before they made the audit" and the audit was made "without regard to the contract between the customer and the seller."

If it is the contention of Gifford-Hill that no tax is due on transportation, we find that the evidence shows that all receipts in payment of charges for transportation of materials that are in controversy were for the cost of transportation prior to sale to the buyer and for services which were a part of the sales, and that the receipts are subject to the sales tax.

But if Gifford-Hill contends that it is not liable for taxes on all of the receipts, and is liable only for a tax on something less than the total receipts, we find that Gifford-Hill failed to establish by conclusive evidence the amount of tax it owes. We think this question is controlled by the settled rule found in Smith v. State, 418 S.W.2d 893 (Tex.Civ.App., Austin, no writ) and State v. Rope, 419 S.W.2d 890 (Tex.Civ. App., Austin, writ applied for), and authorities cited.

The judgment of the trial court is reversed, and we render judgment for the State of Texas against Gifford-Hill and Company, Inc., for the sum of $15,232.31 for taxes, penalties and interest computed through June 30, 1965, plus interest on the delinquent tax of $11,556.63 at six percent per annum on such amount accruing from and after June 30, 1965, until the date of final judgment, with interest thereafter on the total amount at the rate of six percent per annum, and for declaration of priority of the lien of the State over all appropriate

liens, and for foreclosure of all statutory liens imposed by law upon the property of Gifford-Hill and Company, Inc., located within the State of Texas, and for all costs of suit.

Reversed and rendered.