**SPENCER GIFTS, INC., Appellant,**

v.

**Bob BULLOCK, Comptroller of Public Accounts of the State of Texas, et al., Appellees.**

No. 3–88–079–CV.

Court of Appeals of Texas, Austin.

March 8, 1989.

Gilbert J. Bernal, Jr., Shapiro, Edens & Cook, Austin, for appellant.

Bill Kimbrough, Asst. Atty. Gen., Austin, for appellees.

Before SHANNON, C.J., and EARL W. SMITH * and JONES, JJ.

EARL W. SMITH, Justice.

Spencer Gifts ("Spencer") appeals a take-nothing judgment rendered in a bench trial in a tax refund suit. We will affirm the judgment of the district court.

On September 26, 1983, the Comptroller of Public Accounts issued a notice of deficiency determination to Spencer based on an audit of Spencer's sales tax account covering the period from July 1, 1979, to June 30, 1983. On or about May 14, 1985, Spencer paid $121,995.03 in tax and interest under protest pursuant to Tex.Tax Code Ann. § 112.051 (1982) of which amount $116,492.71 remains in dispute.

## SUMMARY OF DISPUTE

Spencer maintains retail stores in various states including Texas, and operates a retail mail order division in Atlantic City, New Jersey. Spencer's mail order sales of gift and novelty items, household supplies, and clothing are accepted in Atlantic City and are filled from its New Jersey and Virginia warehouse facilities. Spencer markets its mail order products through catalogues. The order forms in Spencer's catalogues have a space for entering an item labeled "total" for the sum of the sales prices of the ordered items; a space for entering the amount of state sales tax, with a chart listing rates; a space for an item labeled "postage and handling," with a chart for figuring the amount; and a space for "Amount Enclosed." Some order forms also have an item already filled in for insurance for lost or damaged orders. A customer ordering from Spencer calculates the postage and handling charge based on the total price of the items, for example, on a $5.00 order the customer would enter $1.15 in the postage and handling space. Spencer treated this "postage and handling" charge as a transportation charge excluded from its taxable receipts. The Comptroller concluded that the amounts collected by Spencer for "postage and handling" should have been included in its gross receipts and tax paid on that charge (with the exception of a credit for certain components of this charge for periods prior to July 1, 1981).

## SPENCER'S OPERATIONS

Spencer's mail-order operation worked as follows. Orders were received at the order-filling warehouse, opened and sorted, then sent to another location for production of inventory records and packing slips. The first step of the physical order-filling process occurs at a color-coding station at the start of the conveyor belt which carries plastic boxes ("totes") down an assembly line ("picking line"). Each customer's order uses one tote. At the color-coding station the operator gets information from the packing slip that tells her what color of clips to fasten to the tote. These clips tell the person on the picking line when to take the tote off the belt to see what items from that station must be put in the tote as part of that customer's order.

The particular items needed to fill an order are ready in two rows of bins along the picking line. As each tote passes, operators take the needed items from the stock in the bins and place them in the tote. Behind the two rows of bins are shelves which hold boxes of stock that have been

---

* Before Earl W. Smith, Justice (Retired) Third Court of Appeals, sitting by assignment. *See*

Tex.Gov't Code Ann. § 74.003 (1989).

brought from a bulk storage warehouse to replenish the bins.

After the conveyor belt has carried the tote through the picking line and all the items have been placed in the tote, the conveyor belt carries the tote through a checking section at which operators pick up the order form and scan the merchandise to see that the order was accurately filled. The totes are then stacked together and conveyed to the packing department.

In the packing department, orders are wrapped to make a parcel for shipping or mailing. The parcels go to a weighing station where parcels under one pound are sent to a station at which postage is affixed. Heavier packages are metered and stamped for United Parcel Services (UPS) delivery. UPS parcels are carried to a UPS trailer at the loading dock at the rear of the warehouse. Outgoing U.S. mail is sorted according to zip code and placed in mail bags. The mail bags are then loaded onto a trailer belonging to a contract carrier and taken to Philadelphia to be processed through the U.S. Post Office regional bulk mail facility.

## SPENCER'S POINTS OF ERROR

Spencer contends: (1) that the trial court erred as a matter of law in finding and concluding that Spencer's charge for "postage and handling" was not a separately stated charge for transportation after the sale; (2) there was no evidence, or insufficient evidence to support the trial court's findings and conclusions that Spencer's "postage and handling" charge was not a separately stated charge for transportation after the sale; (3) that Spencer was denied equal protection and equal and uniform taxation under the federal and state constitutions because of the Comptroller's policy of classifying mail order retailers and their charges for transportation based on the labels or descriptions used, without regard to the facts, reasons or processes involved in setting the transportation charges; (4) the court erred as a matter of law in not giving effect to Spencer's documented actual transportation costs occurring after the sale as a credit against its postage and handling charges; (5) there was no evidence, or insufficient evidence, to support the trial court's findings and conclusions that Spencer was not entitled to a credit against its postage and handling charge for its actual documented transportation costs; (6) Spencer was denied its rights to equal protection and equal and uniform taxation under the federal and state constitutions because of the Comptroller's improper and unlawful application of his policy regarding documentation of transportation costs.

We have three parts to our analysis. One part is to give meaning to "transportation" as used in the statute. A second part is to consider whether the Comptroller's reliance on the label attached to an activity to determine whether that activity is transportation—specifically, the categorical disallowance of a charge labeled, wholly or partially, "handling"—prevents the assessment and collection of tax even if Spencer's position on what activities qualify as a transportation charge is incorrect. Finally, we consider whether the Comptroller's policy regarding the documentation of transportation charges requires Spencer to be given credit for parts of its charges.

## APPLICABLE LAW

The audit covers the period from July 1, 1979, to June 30, 1983. In 1981, the codification of the current Tax Code from the former "Texas Taxation—General," Title 122A of the Civil Statutes, and other sources, occurred. 1981 Tex.Gen.Laws, ch. 389, §§ 1–42, at 1490–1787. The relevant definition of "sale" remained the same during the audit period. A sale is any transfer of title or possession, or segregation in contemplation of transfer of title or possession, by any means whatsoever, of tangible personal property for a consideration. Tex.Tax.—Gen. art. 20.01(K)(1)(a), codified at § 151.005(1) of the Tax Code. 1981 Tex. Gen.Laws, *supra*, at 1545. The relevant portion of this section is the language defining a sale as a "segregation in contemplation of a transfer of title or possession," because at issue in this case is whether certain activities occurring after the sale are excludable from Spencer's taxable

gross receipts and at what point in Spencer's order handling process a sale occurred.[1]

Sales price was defined as the total amount for which taxable items are sold. Tex.Tax.—Gen. art. 20.01(L)(1). Sales price did not include "charges for transportation of tangible personal property after the sale." Tex.Tax.—Gen. art. 20.01(L)(3)(f). "Receipts" had a similar definition and exclusion. Tex.Tax.—Gen. art. 20.01(D)(1), (D)(2)(f). These two sections were consolidated into Tax Code § 151.007, "Sales Price or Receipts," defined as the total amount for which a taxable item is sold, excluding a charge for transportation of tangible personal property after the sale. Tex.Tax Code Ann. § 151.007(a), (c)(7); 1981 Tex.Gen.Laws, *supra*, at 1547. In 1981, before the codification, a requirement was added that, in order to exclude items such as transportation charges from receipts, those items had to be separately identified to the customer by such means as an invoice, billing, sales slip or ticket, or contract. 1981 Tax.Gen.Laws, ch. 64, §§ 1, 2 at 140 (effective July 1, 1981).[2]

Texas Tax.—Gen. art. 20.021, "Method of Collection; Bracket System" also dealt with transportation charges: "[w]here tangible personal property is segregated in contemplation of transfer of title or possession and is thereafter to be transported by common carrier from the seller to the buyer, with the price fixed F.O.B. the seller's place of business, and with transportation charges separately stated" that charge could be excluded from the sales price upon which tax was calculated. This part of 20.021(A) was moved to Tax Code § 151.007(c)(7), as codified, excluding post-sale transportation charges from receipts, "including a separately stated charge for transportation of tangible personal property segregated in contemplation of the transfer of possession or title with the terms of the sale at a price fixed F.O.B. at

the seller's place of business." 1981 Tex. Gen.Laws, ch. 389, § 1, at 1547.

The sections discussed above will be referred to by their Tax Code number, without date or session law reference.

## DEFINITION OF TRANSPORTATION

■ The Tax Code does not define transportation. Neither does Spencer offer a definition. Rather, Spencer's theory seems to be that any activity that occurs after the sale is transportation. Spencer sets out several categories of items, extracted from its records, that it claims occurred after the sale and should be allowed as transportation charges. These categories of activities are: labor; overtime and fringe wages; payroll taxes and benefits; packing supplies; postage costs; drop shipments; and freight to distribution center.

The trial court found that the Comptroller's long-standing construction of transportation was "the movement of goods from the possession of the seller to the purchaser." Finding of Fact 74. If the meaning of a statutory provision is unclear, the agency interpretation is entitled to weight. *Calvert v. Kadane*, 427 S.W.2d 605 (Tex.1968); *Direlco, Inc. v. Bullock*, 711 S.W.2d 360 (Tex.App.1986, writ ref'd n.r.e.). The agency interpretation is not binding on the court. *Bullock v. Ramada Texas, Inc.*, 609 S.W.2d 537 (Tex.1980). It is not effective to contradict the statute. *Firestone Tire & Rubber Co. v. Bullock*, 573 S.W.2d 498 (Tex.1978); *Bullock v. Bingo King*, 714 S.W.2d 320 (Tex.App.1986, writ ref'd n.r.e.). The Comptroller's interpretation of "transportation" does not contradict the statute or any existing case law construing the statute and seems to reflect the general meaning assigned to "transportation" in various contexts.

The State cites several cases for the proposition that "transportation" does not include moving goods on the same premises; that "transportation" does not begin until the goods leave the premises.

---

1. The 1984 amendments to the Tax Code, effective October 2, 1984, deleted the "segregation in contemplation of" language. 1984 Tex.Gen. Laws, ch. 31, § 6, at 535.

2. Section 151.007, in its current version, now includes all transportation charges in receipts— whether before or after the sale. Tex.Tax.Code Ann. § 151.007(a)(3) (Supp.1989).

*Blanks v. State,* 169 Tex.Crim. 599, 336 S.W.2d 430 (1960) ("transport" under the Liquor Control Act means carrying or conveying from one place or locality to another place or locality—movement on the same premises, storeroom to garage, was not transportation); *Beaver Reclamation Oil Co. v. Railroad Comm'n,* 112 S.W.2d 765 (Tex.Civ.App.), rev'd on other grounds, 132 Tex. 27, 117 S.W.2d 52 (1938) (removal of oil to another part of same premises covered by lease not transportation); *Miller v. State,* 115 Tex.Crim. 388, 27 S.W.2d 803 (1930) (for transportation under Liquor Control Act, needed to carry off premises). Although not considering transportation in the same context, the cases have persuasive value in showing the ordinary meaning of transportation. Because the Legislature did not specifically define transportation in the statute, we presume it was used in its ordinary sense. *Direlco,* 711 S.W.2d at 362.

Both Spencer and the State cite and discuss *Gifford–Hill & Co. v. State,* 442 S.W.2d 320 (Tex.1969). The transportation in *Gifford–Hill* involved trucks moving aggregate from several bulk storage locations to the customer's job site. The court notes that the transportation was done by common carriers unrelated to Gifford–Hill; that neither Gifford–Hill employees nor equipment were used; and that Gifford–Hill made no profit on the transportation. Indeed, the lower court's opinion, in its discussion of the facts of Gifford–Hill's operation, shows that it was possible for Gifford–Hill to lose money on any particular delivery, as payment in advance for transportation was not required. *State v. Gifford–Hill & Co.,* 428 S.W.2d 451 (Tex. Civ.App.1968), rev'd by *Gifford–Hill,* 442 S.W.2d 320.

The Supreme Court, in overruling the lower court, determined that segregation, and thus the sale, occurred when the aggregate was loaded onto the trucks, contrary to the lower court's opinion that the sale did not occur until the material was delivered to the jobsite and accepted by the customer. Therefore, the transportation occurred after the sale, not before, and Gifford–Hill did not owe sales tax on these amounts. The court framed the issue as "whether the receipts for *reimbursement* of transportation charges are taxable." 442 S.W.2d at 321 (emphasis added). The opinion refers to Gifford–Hill paying for, and then separately billing its customer for, the *cost* of transportation, although the statute then, as now, refers to transportation *charges.* The court in Gifford–Hill was dealing with a situation in which specific costs were associated with a specific order, and the seller was reimbursed for the actual cost of transportation. The court also refers to the transportation charges being "separately computed" as well as separately billed. In the context of the case, that phrase could very well refer to the fact that Gifford–Hill did not set the transportation charges—the unrelated carrier did.

An ALR annotation deals with the taxability of transportation charges. 2 A.L.R. 4th 1124 (1980). The cases, however, do not deal with whether a certain activity is transportation but with when a sale occurred. The factual context of the cases, however, usually involved carrier-type transportation; i.e., activities similar to those that were allowed in Spencer's audit before July 1981. Another ALR annotation deals with the meaning of transportation or "in transit" for purposes of construing insurance policies. 80 A.L.R.2d 445 (1961). One case held that goods had not started "in due course of transit" while being carried by an employee from a storage area to a truck. *Starlight Fabrics, Inc. v. Glens Falls Ins. Co.,* 297 N.Y. 426, 79 N.E.2d 812 (1948). The collected cases tend to show a common understanding that "transportation" excludes activities on the manufacturer's or seller's premises; not beginning until the goods are being loaded for removal from those premises.

Other sections of the Texas Tax Code also weigh against allowing all of Spencer's claimed categories as transportation charges. Spencer wants to claim packaging supplies as a transportation charge. The Tax Code provides a separate exemption for packaging supplies and wrapping, however. Tex.Tax Code Ann. § 151.321

(1982), formerly Tex.Tax.—Gen. art. 20.-04(E)(2). This exemption was in effect during the entire audit period. This section exempts internal and external wrapping, packing, and packaging supplies if sold to a person for use in wrapping or packaging tangible personal property for the purpose of furthering its sale. It applies to items such as wrapping paper, twine, bags, cartons, and tape. A mail order retailer purchases these supplies tax free. It would not make sense for the Legislature to include a separate section exempting packing supplies if such supplies were intended to be encompassed by "transportation after the sale." Further, following Spencer's interpretation with regard to this item would, in essence, allow a "double dip"; that is, Spencer could purchase the supplies tax-free, and then exclude their costs from an item's sales price on which tax is assessed.

The way in which a mail order retailer, such as Spencer, is placed in a comparable position to a third-party service provider (e.g., if at the sale point a different company provided a packing service) is that the third-party service provider would not be purchasing the material for use in furthering the sale of tangible personal property but in furnishing a non-taxable service. As the consumer of the packing supplies it would pay tax on them.

Another structural argument against Spencer's interpretation is the language used in the "manufacturing exemption." Tex.Tax Code Ann. § 151.318(c)(2) (1982); formerly Tex.Tax.—Gen. art. 20.-04(E)(1)(b)(ii). The exemption covers property that becomes a component part or is used or consumed in the actual manufacturing or processing of tangible personal property. The exemption specifically excludes *"intraplant* transportation equipment."* (Emphasis added.) If the activities that Spencer wants to include as "transportation" were intended to be so included, there would have been no need to modify "transportation" with "intraplant." Transportation equipment would simply not qualify.

Another indication of the meaning intended by "transportation" is found in for-mer Tex.Tax.—Gen. art. 20.021(A) discussing transportation charges with the price fixed F.O.B. seller. The State contends that because Spencer's order form contained no provisions for calculating either a price or a transportation charge on the basis of an F.O.B. point, the terms of the sale could not be at a price fixed F.O.B. the seller. We are not determining whether this section required an explicit statement on the order form itself or whether various presumptions supplied by the Uniform Commercial Code might serve to fill in a missing term, but are considering the use of "F.O.B." for insight on the meaning of transportation.

Texas Bus. & Com.Code Ann. § 2.319 (1968) deals with F.O.B. ("free on board") terms. Under § 2.319(a), "F.O.B. the place of shipment" means the seller must "at that place ship the goods in the manner provided in this chapter and bear the expense and risk of putting them into the possession of the carrier; ...." A major function of an F.O.B. term is to deal with duties of the parties with respect to delivery and determine when the risk of loss shifts from the seller to the purchaser. 1 White and Summers, Uniform Commercial Code, § 5–2 (3rd ed. 1988). Nevertheless, using such a term implies that the type of transportation contemplated by the statute is that covered by the U.C.C.—i.e., the goods have left the seller's possession and are in the process of being delivered to the purchaser.

Because of our definition of transportation, we need not resolve any issues concerning when the sale occurred, that is, when the items were "segregated in contemplation of sale." At trial, Spencer argued that a sale occurred when items were brought from its bulk storage warehouse to its order-filling warehouse. The trial court found that the sale occurred at the time at which an item was picked from the bins along the assembly line and matched to a specific customer's order. Because no transportation occurred before the point of sale found by the trial court, it would not matter if Spencer were to prevail and establish a point of sale earlier in the process. All activities occurring after the sale are

not necessarily transportation. We conclude that Spencer's claimed transportation charges include both transportation and non-transportation activities, the latter of which are not properly includable in a "transportation charge," and turn now to Spencer's claims concerning the administration of the tax.

### COMPTROLLER'S POLICY ON "HANDLING" CHARGES

■ Spencer complains that the Comptroller's policy of disallowing an item as a transportation charge based on the label attached is unfair and unconstitutional. Two Comptroller employees testified that, as a matter of general policy, the labels "postage," "shipping," or "delivery" will not draw further scrutiny and an item so labeled will qualify as transportation. They also testified that the use of the word "handling" will cause the amounts to be included in taxable receipts rather than non-taxable transportation. Although sometimes inconsistent and almost incoherent, the overall import of the testimony is less that a charge is or is not *subject to* tax based on its label, but that, as a matter of administration, it is necessary to delineate certain categories. The auditor involved did testify that, even if a charge were labeled "postage," if he saw a $5.00 "postage" charge for an item whose price was $2.00, he would question whether that "postage" amount was transportation.

Administrative convenience may be a justifiable basis for a difference in treatment between different taxpayers. *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 513, 57 S.Ct. 868, 874, 81 L.Ed. 1245 (1936) (imposing unemployment tax on businesses with eight employees, but not seven or less, constitutional); *Colonial Cafeteria–Arlington v. Bullock*, 587 S.W. 2d 211, 214 (Tex.Civ.App.1979, no writ) (citing *Carmichael*). Inequalities resulting from business conditions and activities and not imposed by law are not arbitrary discrimination. *Id.*, citing *Sanchez Morales & Co. v. Gallardo*, 18 F.2d 550 (1st Cir. 1927); *see also Associated Food Services Inc. v. Comm'r of Taxation*, 298 Minn. 277, 216 N.W.2d 253 (1974) (differences in

treatment between food sold through vending machines, restaurants and groceries not equal protection violation because the differences were a result of the way in which vending machine owners did business).

As an example, the "predominant use" policy to determine qualification for the electricity exemption has been upheld. Tex.Tax.Code Ann. § 151.317 (1982); formerly Tex.Tax.—Gen. art. 20.04(R); 34 Tex.Admin.Code § 3.295. A business may have both taxable and non-taxable uses of electricity. If a meter measures both kinds of uses, then the taxpayer must demonstrate that more than 50% of the use is non-taxable to claim exemption. It is an all-or-nothing proposition for each meter. Two businesses could use the same total amount of electricity with a breakdown of 60% taxable and 40% non-taxable uses. If one business structures its operations so as to have the taxable 60% and the non-taxable 40% measured by separate meters, it will not pay tax on the 40% going through the exempt meter. If the other business mixes taxable and non-taxable uses in one or more meters so that no one meter is more than 50% non-taxable, it can claim no exemption. *See Houston Natural Gas Corp. v. Southwestern Apparel, Inc.*, 558 S.W.2d 950 (Tex.Civ.App.1977, writ dism'd).

Spencer's brief extensively discusses its business reasons for labeling and calculating its postage and handling charges in the way that it does. Spencer has a solution—change the wording on its order form. That it has made a business decision that it will have better customer relations by obscuring exactly what is included in "postage and handling" cannot be binding on the Texas tax system.

■ Part of Spencer's complaint is that the policy regarding "handling" is not expressed by rule. It is true that the rule on transportation charges, 34 Tex.Admin.Code § 3.303, does not define "handling" and it is difficult to understand why, with what the testimony indicates is a long-standing policy concerning the label "handling," some definitions have not been incorporat-

ed into the rule. If the use of the label "handling" were an issue of first impression, however, the agency would have been able to make the choice, in its informed discretion, to proceed by a hearing rather than rule-making, and define "handling" in a contested case proceeding rather than by rule. *See State Board of Insurance v. Deffebach*, 631 S.W.2d 794 (Tex.App.1982, writ ref'd n.r.e.). We think that any issue concerning whether this policy should be embodied in a rule goes to the question of the taxpayer's due diligence in complying with the tax laws; i.e., had Spencer inquired about the meaning of "transportation," the evidence supports the inference that Spencer would have been informed of the policy. Due diligence, in turn, is not relevant to whether the tax is owed, but to questions concerning penalty and interest, issues not before us on appeal.

## DOCUMENTATION

For audit periods prior to July 1, 1981, the following three categories of items were allowed as transportation charges: postage costs; drop shipments; and freight to distribution center. These items were allowed as transportation charges based on the Comptroller's policy, in effect before July 1, 1981, of allowing transportation charges to be excluded from gross receipts if they were either separately stated to the customer *or* if the taxpayer could produce a separate breakdown of transportation charges in its books and records. Spencer complains that Rule 3.303 did not change during the audit period and therefore the Comptroller should have treated the above categories in a consistent manner for the entire audit period.

During the audit period, the rule referred to charges "stated separately from the sales price." Neither the statute nor the rule explicitly stated how charges were to be documented and separated from an item's taxable sales price. The Comptroller's interpretation permitted some flexibility. Effective July 1, 1981, however, Tax Code § 151.007 was amended to require that all transportation charges be separately identified *to the customer*. At that point, the Comptroller would not have been free to interpret the statute in a contrary manner. *Bullock v. Ramada Texas, Inc.*, 609 S.W.2d 537 (Tex.1980). The phrase "stated separately from the sales price" had to be interpreted in accord with the statute.

As previously discussed, Spencer's charge labeled "postage and handling" includes non-transportation activities. On the facts before us, Spencer has not complied with the requirement that transportation charges be separately stated *to the customer* because the amount that Spencer shows *to its customer* is a commingling of transportation and non-transportation items.

We overrule Spencer's points of error and affirm the trial court's judgment.